## Pulpress *et al. versus* The African Methodist Episcopal Church *et al.*

*Conveyance of real estate in trust for distribution among a particular class, construed.—Discretion of trustees, how limited by courts of equity.*

1. Where real estate was conveyed to a church in trust as a perpetual fund, the rents, issues, and profits thereof to be applied, under direction of the official body representing said corporation, to the support of the gospel among the coloured people of the cities of Pittsburgh and Allegheny, and the fund is applied to the support of the gospel among the coloured people of the two cities ; there is no violation of the trust, though some of the coloured people and some of their religious bodies do not share in the distribution. The discretion of the trustees as to the distribution, so long as it is honestly exercised, will not be interfered with.

2. If there were a positive transgression, or if the fund were continuously applied in such a manner as to lead to the conviction that the selfishness of the trustees, rather than the design of the founder of the charity, had become the rule of appropriation, or if it were manifest that their discretion was not honestly exercised, it might become the duty of a court to interfere.

APPEAL from the Common Pleas of *Allegheny county*. In Equity.

This was an appeal by Benjamin Pulpress and others, from the decree of the court below, dismissing a bill in equity, filed by them against the African Methodist Episcopal Church of Pittsburgh *et al.*

The bill was filed September 29th 1862, by Benjamin Pulpress, H. B. Williamson, and others, in their own right, and as trustees of the Mission Church; Abraham Cole, minister in charge of the same; John Williams, John Newman, and others in their own right, and as trustees of the John Wesley Church; Lewis Woodson, Adam Watkins, and others in their own right and as trustees of Allen's Chapel, Methodist Episcopal Church, against The African Methodist Episcopal Church of the city of Pittsburgh, and John Peck Matthew Jones and others, trustees of the said corporation.

The bill set forth that complainants are coloured people residents of Pittsburgh, or Allegheny City, and that the Mission Church, John Wesley Church, Allen's Chapel, and the African M. E. Church are, with the exception of a small congregation in Allegheny City, named Brown's Chapel, the only organized religious bodies of coloured people in said cities, whose duty and object it is to support and spread the gospel among the coloured people of said cities.

That on the 15th day of February 1855, Rev. Charles Avery conveyed certain valuable real estate in the city of Pittsburgh to William M. Shinn, Esq., in trust, to be held for the use of said Avery during his life, and upon his decease to the use of the

defendant, the African M. E. Church; the rents, issues, and profits of said real estate to be applied, under the direction of the official body representing said corporation, to the support of the gospel among the coloured people of the cities of Pittsburgh and Allegheny, and in trust to be conveyed to said corporation after the decease of said Avery, subject to the uses, trusts, and purposes aforesaid: and thereafter to remain a perpetual fund, the income and profits thereof to be applied as aforesaid.

That Mr. Avery died about the — day of January, A. D. 1858, and shortly thereafter Mr. Shinn conveyed the premises to the African M. E. Church, subject to the uses, trusts, and purposes aforesaid: and that since the death of Mr. Avery, the said corporation has been in receipt of the annual revenue of the property, amounting to seven or eight hundred dollars, clear of expenses.

That defendants, instead of performing faithfully the duties of the trust, by fairly and rateably distributing said revenues among their several religious bodies of coloured people of said cities, according to their numbers and necessities, or by some general distribution thereof among the coloured people of said cities, for the support of the gospel among them, have claimed and exercised the right to dispose of said revenue at their own arbitrary discretion; and at first, and until very lately, did appropriate the whole thereof to their own use, by employing it to pay the salary of their own minister, or otherwise; which conduct was all the more a perversion of Mr. Avery's bounty, because the defendant's church comprises the most wealthy portion of the coloured people of the two cities, and less than any other of the four religious bodies, stands in need of extraneous aid to support the gospel among its congregation.

That about eighteen months ago, the above-named Brown's Chapel instituted proceedings in the Court of Common Pleas to compel defendants to appropriate to the use of the Chapel a part of the revenue received by them, and to file an account. The defendants denied their liability to account for their distribution of the fund, claiming the right to appropriate the whole to their own corporation. But the court decided that they were liable to account, and were bound to make a general distribution; whereupon defendants, without filing an account, bought off Brown's Chapel from further prosecution of the suit, by making it some small appropriation.

That complainants have frequently requested defendants to make some general appropriation of the revenue they receive among the coloured people of the two cities, but defendants have invariably refused, except that about six months ago, after the decision in Brown's Chapel suit, and on the peremptory demand of Allen's Chapel for a part of the fund, they did offer to pay

the minister of Allen's Chapel $50 a year, which was declined. And they still refuse to make any appropriation whatever to the support of the gospel among the coloured people forming the congregation of the Mission and John Wesley Churches, not only on the ground of their absolute control over the fund, but, as complainants believe, on the ground of a difference in religious discipline and doctrine between themselves and complainants; which would be altogether contrary to the wishes of the founder, Mr. Avery, who took great interest in the spiritual welfare of the Mission and John Wesley Churches.

The bill then charged that defendants had perverted and misapplied the trust fund, and should be removed.

Among other interrogatories were the following, which defendants refused to answer :—

Int. 4.—State what annual salary was paid to the pastor or minister of the African Methodist Episcopal Church just prior to the death of Rev. Charles Avery, and from what source it was raised ?  And what annual salary has been paid him since the death of Mr. Avery, and from what source raised ?

Int. 5.—State what was the average annual amount raised just previous to the death of said Charles Avery, by the members of said church, to be applied by the board of trustees, to the support of the Gospel among the coloured people of Pittsburgh and Allegheny cities, and how and to what specific objects the same was applied ?

Int. 6.—State what amount has been raised since Mr. Avery's death, by said members, for the purpose aforesaid, and how applied specifically ?

The relief prayed for was, That an account may be taken of all and any the said trust property and effects, which have been received by defendants, and also an account of their application thereof; and that defendants may be decreed to pay what shall appear to be due from them in such account; and that they may be removed from being trustees under said deed; and that it may be referred to a master, to report some other corporation or person as a fit trustee in their place; and that meanwhile, some person be appointed to collect and receive the trust estate and effects, and that defendants may be restrained from further interference therein; and also for a reference to a master to report some just and equitable scheme of applying the trust fund, so as most fully and effectually to carry out the benevolent purposes of the founder of this charity, and that the court, if approving said scheme, will confirm the same, and establish permanently the said charity; and for other and further relief, &c.

The answer denied that complainants, with exception of Brown's Chapel, represent the only organized religious bodies in the two cities, whose duty, &c.; admitted the trust as set forth

in the bill, and that defendants have received the rents and income as charged; and have endeavoured in good faith to apply the same according to their best judgment and discretion in fulfilment of the trust, but have not, they admitted, rateably distributed said income among the several religious bodies of coloured people of said cities according to their numbers; and submitted to the court, whether the deed requires of them a *pro rata* distribution, or whether such, or any other general system of distribution can be devised which will be practicable, and at the same time preserve the spirit of the trust.

Denied that "defendants have ever claimed or exercised the right to dispose of the income at their own arbitrary discretion, but submitted that its distribution is committed to them as a sacred trust, for the purposes set forth in the deed, and that the time and mode of distribution for these purposes is left to their discretion without limit."

Admitted that "the greater portion of the income has been appropriated to their own preachers, because more than two-thirds of all the coloured people who have the gospel preached to them, hear it in their (defendants') church; and also, because their preachers occasionally minister in both cities; and also because their congregation contribute mainly to the support of the poor of all the congregations, and are therefore comparatively less able to contribute to the support of the gospel: but denied that defendants have wholly excluded from participation in the fund, all the coloured people of the two cities not connected with their church; on the contrary, that they have appropriated a portion to the bishop's salary and the expenses of Conference, whose duty it is to supply all the coloured congregations of the Methodist Episcopal Churches in both cities with preachers, which salary and expenses are properly chargeable to all the congregations, and said payment was for equal benefit of them all."

And also, that "on February 1st 1862, the board of trustees of defendants' church adopted resolutions to pay $150 to order of Brown's Chapel to the minister in charge, and $50 to order of Allen's Chapel to the minister in charge—both which appropriations were declined—though afterwards Brown's Chapel reconsidered and accepted theirs."

Averred that "according to defendants' best judgment and discretion, the foregoing appropriations were just and proper, and better calculated to promote the objects of the trust than a larger appropriation to Brown's and Allen's Chapels, or than any appropriation to the Mission and John Wesley Churches. Further, that the Mission Church has been provided by Mr. Avery with a perpetual house of worship, free of expense, and that the

[Pulpress *et al. v.* African M. E. Church *et al.*] .

John Wesley Church has never applied to defendants for an appropriation."

Denied that " such proceedings were had in the suit by Brown's Chapel, as alleged in the bill, and made the record therein part of the answer."

Admitted that " applications had been made from time to time for portions of the fund, and that officers representing different congregations might be admitted to the councils of defendants, to discuss the proper appropriation of the income, but defendants have declined to surrender the trust and discretion vested in them, at same time professing themselves ready to abide the decree of any court of competent jurisdiction."

Prayed that " the court would devise some general order or decree for their direction, whereby they may be enabled to fulfil the trust reposed in them, without being subject to continual litigation."

Denied that " defendants have been influenced in their disbursements by consideration of the doctrine or discipline of the applicants,"' but have sought, in good faith, to exercise the discretion vested in them.

Admitted that Mr. Avery was deeply interested in the welfare of the religious bodies represented· by complainants, but he did not choose to name them in connection with this fund, or constitute them co-trustees. .

In answer to interrogatories, defendants admitted the receipt of $2971.58, as follows:—January 28th 1859, $656.88; January 31st 1860, $677.47; January 22d 1861, $772.68; January 31st 1862, $810.55; and

Referred to schedules E and F for their disbursements.

Schedule E being the account filed in the suit by Brown's Chapel, and schedule F the account of disbursements since that time.

Defendants declined to answer 4th, 5th, and 6th interrogatories unless required by the court.

To the refusal of the respondents to answer the interrogatories above mentioned, exceptions were filed, but on argument were overruled by the court. Subsequently the court dismissed the bill, there being nothing before the court except the bill, answer, and replication.

This appeal was then taken, and the action of the court below overruling the exceptions and dismissing the bill were assigned for error.

*H. Burgwin,* for complainants.

*William M. Shinn,* for respondents.

[Pulpress *et al. v.* African M. E. Church *et al.*]

The opinion of the court was delivered, November 3d 1864, by
STRONG, J.—The complainants are coloured people residents of
the cities of Pittsburgh and Allegheny, and they have filed this
bill in their own right, and as ministers or trustees of three con-
gregations of coloured people worshipping in those two cities.
The defendants are the corporation minister and trustees of
another church of coloured persons in the city of Pittsburgh.
The objects of the bill are to obtain a decree dismissing the
defendants from a trust which they hold under a deed from the
Reverend Charles Avery, to compel an account, and the estab-
lishment of a scheme of distribution. The reasons alleged for a
dismissal of the defendants from their trust are that they have
perverted and abused their trust; that instead of fairly and rate-
ably distributing the revenues of the property granted to them
among the several religious bodies of coloured people of the
said cities, according to their numbers and necessities, or by
some fair general disbursement among the coloured people of said
cities, for the support of the gospel among them, they have
claimed and exercised the right to dispose of said revenues at
their own arbitrary discretion, and at first, and until recently,
have appropriated the whole thereof to the payment of the
salary of their own minister. Of course, whether the acts
either of omission or commission complained of were transgres-
sions of the trust, depends upon the nature of the trust as
defined by the deed which created it. The deed was made on
the 15th of April 1855. It conveyed to William M. Shinn, Esq.,
certain real estate in the city of Pittsburgh, to be held in trust
for the use of the grantor during his life, and upon his decease
for the use of the defendants, " The African Methodist Episcopal
Church;" the rents, issues, and profits of said real estate to be
applied, under the direction of the official body representing
said corporation, to the support of the gospel among the coloured
people of the cities of Pittsburgh and Allegheny, and in trust to
be conveyed to said corporation after the decease of the grantor,
subject to the uses, trusts, and purposes aforesaid, and thereafter
to remain a perpetual fund, the income and profits thereof to be
applied as aforesaid. Mr. Avery died in 1858, and the grant
in remainder then took effect. It was a grant in trust for the
support of the gospel among the coloured people of the two
cities. It was not the creation of a trust for the coloured people
in the aggregate, like a gift to the poor of a certain parish, nor
was it a gift to all the religious bodies of coloured persons in the
cities. It was not a gift to support the gospel where it was not
already supported, or in those churches which embraced the poor
mainly. The objects of the charity are not thus defined. If the
fund be applied to the support of the gospel among the coloured
people of the two cities, there is no violation of the trust, though
12 WR.—14

some of the coloured people, and some of their religious bodies, do not share in the distribution. The founder of the charity named the class within which the objects of his bounty must be found, but the particular members of that class he did not undertake to define. That he left to the defendants, and committed it to their discretion. It is a discretion which the complainants cannot control, nor ought a court of equity to interfere with it, so long as it is honestly exercised. That would be to substitute the discretion of a court for that of those whose discretion was made the rule of application by the founder of the charity, and to make the substitution without reason. It would destroy the trust rather than enforce it. The discretion to which the fund was committed may not have been most judiciously exercised, but it is not one of the conditions upon which the trust is held, that there shall be no mistake in judgment. If there were a positive transgression, or if the fund were continuously applied in such a manner as to lead to the conviction that the selfishness of the trustees, rather than the design of the founder of the charity, had become the rule of appropriation, or if it were manifest that their honest discretion is not exercised, it might become the duty of a court to interfere. But nothing of the kind appears in the present case. For aught that appears, the application of most of the fund to the support of the ministration of the gospel in the Wylie Street Church may have been the most judicious disposition which could have been made of it. It was an application within the appointed limits of the trust. Had the fund been subdivided among numerous churches, its benefits might have been lost. It was not controverted on the argument that two-thirds of the coloured population of the two cities, who hear the gospel at all, hear it in the Wylie Street Church. It is quite too much for us therefore to say that the trust has been abused. We have already said that under the deed of Mr. Avery, the poverty of any particular congregation gives it no superior rights over those comparatively less poor. Hence the fact, if it be a fact, that the Wylie Street Church has more pecuniary ability than the complainants, is no reason why the fund should not be applied to the preaching of the gospel there.

For these reasons we are of opinion that there is no ground for removing from the trust the trustees selected by the founder of the charity. Nor is there any reason for taking steps to interfere with the reasonable discretion of the trustees, by referring the case to a master to report a scheme of distribution, even if the complainants were in a position to ask for such reference, in regard to which we express no opinion. We hold, therefore, that the bill was rightly dismissed.

The decree of the District Court dismissing the complainants' bill is affirmed with costs.